Are you ready? Good morning and may it please the court. I don't know how many dozens of times I've stood here over the years, over 45 years now, but I've never felt so strongly about a case as I have this one, which has made it difficult for me. But, you know, even in this technological age that we live in and are at times overwhelmed by, a good old-fashioned roadmap is very helpful. And Judge Davis on February 4th drew us a magnificent roadmap for this case in the Antone decision. And had I briefed the case within the last month rather than last summer, I would have absolutely highlighted Antone. Because the Antone case fits this one like a glove, as does Judge Britt's masterful decision in the Wright case, W-R-I-G-H-T, which is in the record at page 621. Excuse me, and Judge Britt's decision in Wright was in January of last year. What is emphasized in Antone and in Wright that is so applicable to this case is that the critical point that we have to focus on for the important third prong of 18 U.S.C. 4248 is now, not way back when. Judge Davis made it clear in Antone that they were overemphasizing the thesis of, well, he did it once, he may do it again. He did it once some years ago. But what is clear as a bell from both the statute and from the opinion in Antone and Judge Britt's opinion in Wright is that what we've got to focus on is the here and now. Not 10 years ago, not 15 years ago, not 20 years ago. It is, and again, Randall Cook's case mirrors Antone and Wright in that he has, in the entire time he's been incarcerated, he has not been found in possession of any pornography, either store-bought or homemade, and you wouldn't believe some of the stuff they find out there. He's not been found with any of that. He's not been found with any contraband of any kind. There has been no sexual misconduct of any kind in the entire time he's been incarcerated. No alcohol, no misuse of drugs. He has, of course, been sanctioned four or five times over the course of the years, but nowhere near as many times as Wright and Antone were and many others, and I've contrasted it in the brief, contrasted this case with a number of others where there have been far more sanctions, far more sexually-related sanctions, far more findings of homemade scrapbooks taken from ballet costume catalogs and gymnastics catalogs and that sort of thing. Those things are found frequently out there, as well as more garden-variety pornography that you can buy on the newsstand and get on the internet. None of that has been found with Randall Cook, none of it. And also, we need to not only focus on the here and now as opposed to way back yonder, he's a good deal older now. He is not 39. He was 39 years old the last time he inappropriately touched a child. But he is now 51 and is nowhere near in as good health as he was when he was 39. In his testimony, he said that he would give anything to be as healthy as he was back when he was 39 years old, but he's 51 now and he's an old 51, way out of warranty. The Bureau of Prisons, in its wisdom, has assigned him a 24-7 inmate nanny, if you will, because he can't wheel himself up and down inclines anymore. And he needs help in the dining hall and needs help getting in and out of the shower from his wheelchair. Yes, he was in that wheelchair when he last offended. When he always offended, didn't he? Didn't all of these offenses occur? I think you're right. I think the very first time, I think he had some nickel-dime non-sexual criminal activity before his accident, but nothing of any significance. So yes, he was always in a wheelchair, but he wasn't always in the health he's in now. But isn't there contrary evidence, isn't there conflicting evidence on whether or not his health has deteriorated or not? Whereas my recollection is that his treating physician said that there'd been minimal or no deterioration. Well, the treating physician is the treating physician for 900 guys out there. Does that make him unbelievable? Well, I think to some extent. He testified on cross-examination that he did not order any of the tests that had been recommended by the specialists in this case and that he disbelieved Randall Cook. If you compare his testimony with that of Dr. Moore-Arteagues, they're the only two physicians who testified. The other experts were psychologists. If you compare Dr. Ramsey with Dr. Arteagues, they're radically different. And the government, of course, has made a lot of the fact that so much of Dr. Arteagues' testimony was based on what Randall Cook told her. Well, again, there's the old medical school aphorism of listen to your patient. He's trying to tell you the diagnosis. And if you compare her testimony with that of Dr. Ramsey's, yeah, there's a conflict, but it's clear as a bell which one's the better reason. You didn't, in your description of Mr. Cook's behavior while incarcerated, reference what appeared to concern the district court about his pursuing an interest in another inmate, the troubled young boy? At Rochester. At FMC Rochester, that incident. I'm not sure. Was there more than one? No. I just want to make sure I understand the question, Your Honor. This is the incident about having an interest in another inmate at the Federal Medical Center at Rochester. Well, why don't you address that one? Yeah. First of all, there are no children in the federal prison system. They're all grownups. This particular inmate, we don't know how old he was, except he was in his 20s. So one gay man is attracted to another. This is under the prior case law of this court, Caporal and Francis, as I recall. There's nothing deviant about that. There's nothing illegal about that. It was not acted on. And more to the point, the Bureau of Prisons at no time sanctioned him for that conduct at FMC Rochester. And believe me, the Bureau of Prisons can sanction them for looking cross-eyed at the wrong guard. It happens. They know how to sanction people. The fact that he was not sanctioned at all at Rochester is, I think, very significant. And I say that because I know how easy it is to get sanctioned out there. So what we had at Rochester was, you know, one gay man attracted to another. Well, this happens in the BOP system. I wish Randall Cook were here today. I'm the only one in the room that's ever seen him. It occurred to me last night, reading some stuff, some notes that he wrote for me on the Anton case, how much his handwriting has deteriorated just in the time I've known him. And, of course, I've seen the braces that he wears on both hands. I saw him squirming constantly in the two-day trial in his wheelchair because of his necrotic hip. This young man, and he is young to me, he's 20 years younger than I am, he's going to have all he can say grace over trying to keep body and soul together when he gets home to Tennessee. He's going to have to be in assisted living. And the government and Judge Gates made a lot of the fact that, well, we don't have a firm, concrete release plan. Well, of course not. We don't know when he's getting out. Mr. Craven, going back to the issue that Judge Duncan raised with you, the expert described that adult inmate as vulnerable. Can you elaborate somewhat on that? We all understand, as you say, there are no pubescent boys in the Bureau of Prisons. But what did the judges below mean and what did the expert mean when they described this person as, quote, unquote, vulnerable? I don't know because I don't believe there's anything in the record, and I don't recall ever seeing anything that really described this young man. His name is in the record. It escapes me right now. I don't really know anything about him except he's in his 20s. And he was described, as you indicate, he was described as a vulnerable young man. And I raise the question, was he more vulnerable than Randall Cook in a wheelchair with a urine collection bag flopping down by the side? I don't know. But we don't know much about this other inmate. And yet we have the expert using that term and resting decision-making on that term. And it appears, from my review of the record, that both of the judges below accepted that characterization and tied it to certain behaviors reflected in the record engaged in by Mr. Cook previously. I don't think anyone has ever denied that that young man was vulnerable. And not simply because he was in the Bureau of Prisons. No, no, no, no, no. It was vulnerable otherwise. And I wish I knew more about him, frankly. None of the specifics about his vulnerability ever came out or were ever in any of the discovery material that I recall. Counsel, Mr. Cook may well be as incapacitated and as relatively harmless as you portray him. But we have credibility findings. We have standards of review that don't appear to let us go behind the characterizations and the expert testimony that the court credited. No, I understand. I understand the conundrum there. I think, again, I think Judge Davis put his finger on it in the Antone case where he wrote here, as in Wooden, we have again been left with the definite and firm conviction that a mistake has been committed. And also, quoting from, I think, Wooden or maybe Hall or Caporal, the cases tend to run somewhat that deference to the fact finding below does not mean that the appellate review is toothless. The, yeah, while clear error review is deferential, it is not toothless. We may reverse if upon reviewing the district court's ultimate mixed findings, we are left with the definite and firm conviction that a mistake has been committed. And that's from Wooden. And then Judge Davis spoke of the inadequate consideration of certain substantial evidence, namely Antone's behavior in the past 14 years or so. Yeah, you're going to have credibility issues here. And ordinarily, the court has to be deferential to the district court. But as Judge Davis indicated in Antone, which was a unanimous decision, at times we just have to realize that while it's a great system and the train usually runs beautifully, sometimes it just jumps off the track. And I think that's this case. And that's why I said I wish Randall Cook were here, because I think you could see how dangerous he is. Mr. Craven, let me ask you a question before you finish. With regard to this vulnerable inmate, wasn't there some testimony in the record that he had psychological problems? Well, that hardly singles him out in the BOP system. I don't remember. Probably so. I don't recall, but it would not surprise me. But my gracious, don't half of them? From my experience. Maybe you know more than I do. You know, there are a lot of vulnerable folks in the BOP system. OK. Thank you. Let's hear from Mr. Fisak. Thank you, Judge Traxson. Good morning. May it please the court. My name is Matthew Fisak. I represent the United States in this appeal. The judgment below should be affirmed because the district court did not commit any clear error in finding on the basis of expert testimony that it found more credible and persuasive than Cook's evidence. Could you lean a little closer to the mic? Yes, and I can move it as well. That Mr. Cook currently suffers from a paraphilia, which is a sexually based disorder, a serious mental disorder under the Adam Walsh Act. And secondly, that he will have serious difficulty in refraining from child molestation if released, taking into account not only his current circumstances and his current state of health. To begin with, Mr. Cook has been convicted of three hands-on sex offenses, all against adolescent children, adolescent boys. He was in the process of grooming a fourth boy, a 12-year-old in 2001, when he was arrested, charged, and convicted of a possession of child pornography. I'd like to make two key kind of preliminary points about that criminal history. One, as Judge Traxler pointed out, they were all committed after the motorcycle accident that left him paralyzed and in a wheelchair. But in addition, the most recent offense in 2001 occurred after he was permanently catheterized, after he had had surgical intervention for kidney stones and some of these other medical issues that he raises. And I believe also there might have been some evidence that he was experiencing muscle spasms at that time. So these medical conditions that Cook raises as his defense have not proven to be an impediment to his sexual offending. The second key point I want to make, Cook's offending, his modus operandi of offending, so to speak, is emotionally driven. It's not physically driven. It's not a seeking of physical pleasure. He likes to give pleasure to these boys, not to receive it himself. And he targets these young, troubled boys, this by his own admission, as well as by his conduct. And then he mentors them into, quote unquote, sexual manhood. That was the testimony and the impression that Dr. Demby gave at the hearing. And what he does is it starts with an emotional attachment, a friendship even, with these boys. It develops into an infatuation, a falling in love. It leads to touching. And it culminates, typically, in a proposition for oral sex. And I would like to touch on the question of the more recent incident that occurred in the Bureau of Prisons in 2004 with a young, troubled inmate. He was referred to as vulnerable. And there is a three-page memorandum in the record. It's at 840 to 842 that describes some of what was vulnerable. 840, volume three, describes what was vulnerable about that particular inmate. He was himself a sex offender. He was engaged in sex offender treatment. He was also described, I believe, as a mental health patient of the psychology department at Rochester. He was described as naive and frightened by Mr. Cook. Apparently, Cook became quite attached to this young man, started following him around to the chow hall. Some of the other inmates were then making fun of him, saying that Mr. Cook was his wife. And it's also in the record that this young man was confused about his sexual orientation. And that, again, is a common thread with going back to the 2001 incident with the 12-year-old boy that led him to the federal charges. Because that boy, again, was described as being emotionally vulnerable. He was from a broken home. Cook used that fact to develop a rapport with the boy, to start a relationship, to talk to him about his problems. And that boy was also described as being confused about his sexual orientation. So that ultimately all supports Dr. Demby's opinion and Dr. Zinnick's opinion, too, that Cook seeks out these young, troubled boys and confused boys, boys who are not sure about their sexual orientation. He introduces them to his preference of a homosexual lifestyle and shepherds them, so to speak, into sexual manhood. Now, the district court, in following this Fourth Circuit's precedents, including, I assume, conducted an analysis both of Cook's past and his present condition. And because of Cook's unique circumstances with his handicap, that included a very thorough consideration both of his physical condition and, of course, his psychological condition as required under Kansas v. Crane. Starting with his physical condition, his physical condition, the evidence showed, is not markedly different now than it was at any point in the past when he was committing sex offenses against children. The district court received expert testimony from two physicians. Dr. Arteag testified that Cook's health had declined over 12 years of being incarcerated in the BOP. I don't think the government presented any evidence necessarily to conflict that. But I also think it's of real marginal relevance. And it's superficially true, because pretty much anyone that's in the BOP is going to be there for a long time. And it's kind of a truism that health is going to decline somewhat over a lengthy period of time. The key to this case and the district court's rejection, ultimately, of Dr. Arteag's opinions is that there were serious limits to what she testified to and the basis of her opinion. First of all, it was based almost exclusively on Cook's interview with Cook and his self report. She failed to review thousands of pages of medical records and eventually, I believe, reviewed only about 300 pages of medical records from 2010 to the time of the hearing. And she never conducted any kind of physical examination of Cook. By contrast, the government's expert, who was Dr. Ramsey, was the attending physician and had seen Cook regularly every three to four months for examinations and was very familiar with his entire medical history. One, I think, main example would be there was a dispute over Cook's carpal tunnel syndrome and how severe that was. I don't think there's any dispute that Cook has carpal tunnel, but Dr. Arteag's diagnosed it as a serious carpal tunnel. She did so solely on the basis of Cook's self report, that it was serious. And then she went on and gave this opinion that Cook wouldn't be able to drive, he wouldn't be able to take care of himself, that he would be confined to assisted living for the rest of his life. But that, Your Honor, does not jive with a lot of other objective evidence in the record. There was a five-page handwritten letter that Cook himself was able to write that was introduced into evidence.  He's been observed by the BOP personnel who testified at the hearing, being able to get around the compound at Butner in his wheelchair. Yes, sometimes that involves an inmate companion, but other times he's able to do so independently. So on that basis, the district court made a credibility determination, which is entitled to deference, which is that Cook's condition is stable, that it has not been deteriorating. And ultimately, in conjunction with the testimony of the psychologists, that his physical and medical condition is not a protective factor that's going to reduce his risk of re-offense. And that's because he's still able, physically, to get around. He can use his hands. He can use his mouth. And those are the tools that he needs to commit additional sex offenses against children. I'll also just briefly touch on the facts on his psychological condition, both past and present, which the district court determined had not improved. Cook has never completed a sex offender treatment program. I think that's a fundamental distinction between this case and the Antone case. Because in Antone, as I read it, requires a conjunction, both of a completion of treatment and then a demonstrated change in behavior. Cook has never completed sex offender treatment. He has never developed a relapse prevention plan. He says he has gained insight into his offending, but all his rehabilitative efforts by his own testimony simply involved self-education, reading books, and other types of self-help measures. And in the Bolander case, this court has held that self-help measures are inherently suspect. But even more than that, Dr. Zinnick in this very case testified that he had never seen a sex offender with problems as serious as Cook's successfully address them through self-help. So the district court had that testimony also to rely upon. Dr. Zinnick testified that Mr. Cook does not talk like a treated sex offender. Cook says his fantasies, he doesn't have fantasies towards children anymore, or if he does, they're under control. But the district court placed a lot of weight and conducted a very thorough analysis on the fact that Cook was in this very same position in 2001. And in 2001, he told the FBI, you know, I have these urges, these fantasies, but they're under control. I'm not going to act upon them. But then he went out, he started grooming the 12-year-old boy, he took him out, he felt him, attempted to perform oral sex upon him. At that point, he, according to his own testimony, felt disgusted by it, realized it was wrong, but then persistently kept trying to initiate contact with the boy, even to the point of And that persistence and the similarity between what he did in 2001 and what he again tried to do in the Bureau of Prisons with the 22-year-old inmate was evidence that the district court properly considered as evidence of ongoing volitional impairment. Are there any particular questions that I can entertain from the court? Somewhat off point, but I'm just really curious to know if you have any experience or knowledge. In these cases, these Adam Walsh cases, have there been any instances in which the respondent has refused to testify or declined to testify? Uh, yes, Judge Davis. There have been? There have been, yes. And the case just proceeds, the government's presentation proceeds without the respondent's testimony, I take it? Uh, I'm aware of one case, I cannot off the top of my head think of the respondent's name, who elected to proceed pro se, it was Perez, it was just argued in January. Elected to proceed pro se and then, um, absented himself from the hearing entirely. I see. That's the only instance that comes to mind? Comes to mind, yes, Your Honor. All right, I just was curious. I have no other questions. I think we understand your positions to this day. All right, thank you. Uh, while, while there's certainly an emotionally driven, uh, component to all this, obviously there would almost have to be, uh, Dr. Plodd indicated in his testimony, uh, and his track record is remarkable in these cases, Dr. Plodd indicated that, that the misconduct that Randall Cook had engaged in here for, was the result of choices that he made, choices that he affirmatively made, and Dr. Plodd explained in his testimony why he believes that Randall Cook is no longer drawn to young boys, that he's drawn to, uh, uh, you know, adult, adult males now. And Dr. Denby from the BOP, uh, the Public Health Service, uh, uh, echoed that to some extent. All three of the experts in the case, uh, of the expert psychologists in the case, all three, uh, agreed that hemophilia was not, not a factor here. And in fact, that hemophilia, uh, you know, we know now it's been turned down by the last two editions of the, uh, DSM, four and five. Uh, I'm not sure that the government has met the requirement that it has to meet in prong two here. Now, I've focused on prong three, and, you know, again, it's, they've got to get the ball in all three baskets, as I said in the brief. We've conceded prong one, uh, so prong two and three are the ones that are up in the air, and we've focused on prong three, uh, the likelihood that he might re-offend in the future. Uh, but I'm not entirely sure the government has met its responsibilities in prong two. Now, the, there was reference made to the carpal tunnel syndrome. There was an implication that, that, uh, that this was a self-diagnosis that was self-reported to Dr. Artigues. The record's clear it was diagnosed first at the Mayo Clinic when, uh, when Randall Cook was at the Federal Medical Center of Rochester. And, of course, the reason that facility is there is because of the proximity to the Mayo Clinic. But that's where it was, that's where it was diagnosed first. Now, Mr. Waven, can I interrupt you just a sec? Yes, sir. I just need some help with, uh, this, uh, general question. This, your, your client refused to participate in the sex treatment program that was available at Butner, and apparently others have, too. Is there some legal impediment, or can you explain to me what? Yeah, I was just, as a matter of fact, I was, I was truly just about to get to that. Okay. And Judge Britt addresses that to some extent in his decision in Wright, which is in the, in the record. Uh, many of the, well, not many, most of the guys out there purposely keep their distance from the Butner program because they know and, and are, in fact, told that, you know, anything you say can be used against you. And they are encouraged to, to go back in there over the last, you know, ever since they hit adolescence and, and write it all out. Confess everything you've ever done or ever thought about doing. Uh, and, and, uh, you know, we're from the government. We're here to help you. Well, uh, a number of them are understandably leery of that, and Judge Britt, in his Wright opinion, uh, uh, indicated he can understand why. Uh, now, Randall Cook, uh, tried to get into the program. It was a, it was recommended by the district judge in Memphis who sentenced him, uh, 12, 12 years, 12, 14 years ago, uh, in, in the porn case, and he tried to get into a treatment program at Rochester, and they didn't have one then. And, uh, uh, then he asked to be sent to Butner because he knew there was a program at Butner, but when he got to Butner and found out that you, you're expected to tell it all and, and, and frankly, many of them have testified that they're encouraged to embellish, uh, and that it can be used against you, uh, he decided, you know, no thanks. And Judge Britt addresses that well, and he points out a number, he mentioned several other cases of folks that have been released from custody who, who just declined to participate in the program at Butner. Randall Cook has made it abundantly clear that he is not only willing but eager to participate in such a treatment program, uh, when he, when he gets home to Tennessee, and, and I can assure the court that we have looked into that, uh, and I'm anticipating that that will not only be available to him but, but perhaps required by the probation officers, the same good probation officers in Memphis that the district court's afraid won't be able to keep up with Randall in his wheelchair. Okay, so thank you. Thank you, sir. We'll come down and greet counsel and then take a short break for about five or ten minutes. This honorable court will take a brief reset.
judges: William B. Traxler, Jr., Allyson K. Duncan, Andre M. Davis